Christopher Sproul (State Bar No. 126398)
Stuart Wilcox (State Bar No. 327726)
ENVIRONMENTAL ADVOCATES
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376
Facsimile: (415) 358-5695
Emails: csproul@enviroadvocates.com
wilcox@enviroadvocates.com

Attorneys for Plaintiff
LOS ANGELES WATERKEEPER

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN RECLAMATION, INC., and JOHN R. GASPARIAN,<br><br>Defendants. | Civil Case No. 21-cv-1140<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et. seq.) |

Los Angeles Waterkeeper ("LA Waterkeeper" or "Plaintiff"), by and through its counsel, hereby alleges:

## I. <u>INTRODUCTION</u>

1.      This complaint seeks relief for alleged unlawful discharges of pollutants from the South Coast Recycling Facility located at 4560 Doran Street, Los Angeles, CA 90039 ("the Facility") into waters of the United States in violation of the Federal Water Pollution Control Act, 33 U.S.C. sections 1251, *et seq.* (the "Clean Water Act" or the "CWA") and the State of California's National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001 [California State Water Resources Control Board] Water Quality Order No. 97-03-DWQ ("1997 Permit"). The Facility is owned and operated by American Reclamation, Inc. and John R. Gasparian ("Defendants" or collectively, "American Reclamation"). This Complaint further addresses American Reclamation's violations of the predecessor version of the Industrial Stormwater Permit issued by the California State Water Resources Control Board ("State Board") by Water Quality Order No. 91-013-DWQ (as amended by Order No. 92-116) in 1991/1992 ("1992 Permit"), the version issued by the State Board in 1997 via Water Quality Order No. 97-03-DWQ ("1997 Permit") and its violations of the version of Industrial Stormwater Permit issued on April 1, 2014 by State Board Water Quality Order No. 2014-0057-DWQ and effective on July 15, 2015 ("2015 Permit") (note: as context appropriate, the term "Industrial Stormwater Permit" as used herein refers to either of these three versions of the applicable NPDES permit for industrial stormwater discharges in California or collectively to all three versions). All three of these versions of NPDES Permit No. CAS000001 had/have similar terms and conditions. All references to sections of the version of NPDES Permit No. CAS000001 adopted by Water Quality Order No. 2014-0057-DWQ should be construed as equally referring to comparable sections in the State Board's orders adopting the 1992 and 1997 versions of this permit.[1]

---

[1] The version of NPDES Permit No. CAS000001 adopted by Water Quality Order No. 2014-0057-DWQ became effective July 1, 2015 and supersedes the version of this permit adopted by Water Quality Order No. 97-03-DWQ "except for Order 97-03-DWQ's requirement to submit annual reports by July 1, 2015 and except for enforcement purposes." Water Quality Order No. 2014-0057-DWQ at 1 & § I.6

2.      Violations of the CWA and the Industrial Stormwater Permit by small industrial sites are recognized as a leading cause of significant, cumulative impacts to the water quality of the Los Angeles River and the Pacific Ocean. With every rainfall event, hundreds of millions of gallons of polluted rainwater flow off of local industrial facilities, such as American Reclamation's, and pour into storm drains and into the Los Angeles River and the Pacific Ocean. The consensus among agencies and water quality specialists is that stormwater pollution accounts for more than half of the total pollution entering the aquatic environment each year.

3.      Stormwater runoff from the American Reclamation Facility in combination with similar runoff from other industrial facilities is causing or risking harm to humans and aquatic life. In particular, the Facility's stormwater discharges, like other facilities in the watershed, contain suspended sediment and heavy metals such as cadmium, iron, copper, lead, and zinc. Exposure and ingestion of heavy metals can cause health problems in people and aquatic animals, including neurological and reproductive effects. Fish are widely used to evaluate the health of aquatic systems because pollutants accumulate in fish, which are an important part of aquatic food chains. Heavy metals have been shown to alter physiological activity in tissues and blood of fish.

4.      Stormwater runoff from the American Reclamation Facility, like other industrial facilities in the watershed, further contains high concentrations of total suspended solids ("TSS"). High concentrations of TSS degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. Suspended solids have been shown to alter predator-prey relationships (for example turbid water can make it difficult for fish to see their prey). Deposited solids alter habitat for fish, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons ("PAHs"), are

---

(Findings). Thus, all requirements imposed by Water Quality Order No. 97-03-DWQ will remain in full force and effect after July 1, 2015. However, the requirements imposed by Water Quality Order No. 2014-0057-DWQ also came into effect after July 1, 2015 and American Reclamation's future violations of such Order's imposition of NPDES permit terms essentially identical to those ordered by Water Quality Order No. 97-03-DWQ are also enforceable.

adsorbed onto TSS. Thus, higher concentrations of TSS mean higher concentrations of toxins associated with those sediments.

5.      Stormwater runoff from the American Reclamation Facility, like stormwater runoff from other sources in the watershed, also contains potentially pathogenic bacteria which poses human health risks and excessive nutrients which can lead to depressed oxygen levels harmful to aquatic life.

6.      American Reclamation's stormwater discharges contribute to the ongoing stormwater pollution problem and exemplify the epidemic of violations of industrial stormwater permits that LA Waterkeeper is seeking to eliminate or reduce. These pollution discharges can and must be curtailed for the Los Angeles River and the Pacific Ocean to be restored to ecological health.

## II.  JURISDICTION AND VENUE

7.      This is a civil suit brought under the citizen suit enforcement provisions of the CWA. This Court has subject matter jurisdiction over the parties and subject matter of this action pursuant to CWA section 505(a)(1), 33 U.S.C. § 1365(a)(1), and 28 U.S.C. section 1331 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

8.      Plaintiff mailed, in two parts and by certified mail, the notice letter and supporting documentation outlining Defendants CWA violations that form the basis of this lawsuit and providing all legally required information on November 9, 2020 and November 10, 2020. The recipients of these certified mail mailings included the required recipients under the CWA and its implementing regulations: "the owner or managing agent of the" facility, the Administrator of the Environmental Protection Agency ("EPA"), the EPA Region IX Regional Administrator, the California State Water Resources Control Board, the registered agent for American Reclamation in California, and the Attorney General. 40 C.F.R. § 135.2(a)(1), (b); *see also* 33 U.S.C. § 1365(b)(1)(A). These recipients are deemed to have received notice on the postmark date, *i.e.,* November 10, 2020 at the latest. *See* 40 C.F.R. § 135.2(c). Certified mail tracking information indicates that these recipients all in fact received the certified mailings and that receipt occurred between November 12, 2020 and November 17, 2020.

9.      More than sixty days have elapsed since Plaintiff gave notice of the claims in this lawsuit to Defendants and the relevant state and federal agencies. Neither EPA nor the State of California has

commenced or is diligently prosecuting a court action to redress the violations alleged in this Complaint, and no claim in this action is barred by any prior administrative action pursuant to section 309(g) of the CWA, 33 U.S.C. § 1319(g).

10.     Venue is proper in the Central District of California pursuant to CWA section 505(c)(1), 33 U.S.C. §1365(c)(1), because the source of the violations is located within this judicial district.

### III. PARTIES

11.     Los Angeles Waterkeeper is a 501(c)(3) public benefit corporation, organized and existing under the laws of the State of California with a principal office at 120 Broadway, Suite 105, Santa Monica, California 90401. LA Waterkeeper was founded in 1993 with the mission of preserving, protecting, and defending the inland and coastal waters of Los Angeles County from all sources of pollution and degradation. In pursuit of this mission, LA Waterkeeper actively seeks federal and state implementation of the CWA, and, where necessary, initiates enforcement actions under the CWA on behalf of itself and its members. Members of LA Waterkeeper (including citizens, taxpayers, property owners, and residents) live, work, travel, recreate, own property and homes, and reside in Los Angeles County. They use and enjoy the waters into which American Reclamation causes pollutants to be discharged, including the Los Angeles River, other Los Angeles County waterways, and the ocean and beaches into which those waters flow (hereinafter collectively referred to as "impacted waters"). Members of LA Waterkeeper use these waterways for recreational, educational, aesthetic, and spiritual purposes. Additionally, LA Waterkeeper and its members use these waters to engage in scientific study through pollution and habitat monitoring and conservation activities. American Reclamation's discharge of stormwater containing pollutants impairs each of those uses. Thus, the interests of LA Waterkeeper's members have been, are being, and will continue to be adversely affected by the degradation of these waterways resulting from American Reclamation's failure to comply with the Industrial Stormwater Permit and the CWA.

12.     Defendant American Reclamation performs recycling and associated activities, including vehicle maintenance and fueling, in Los Angeles, California. Industrial activities at the Facility generate dust; toxic metals such as copper, cadmium, lead, aluminum, iron, and zinc; oil and grease; nitrites and

nitrates; bacteria, including total coliform and *E. coli*; and TSS and pH-affecting substances. During rainfall events, these substances are entrained into stormwater that flows over and across the Facility and enters the Los Angeles River and the Pacific Ocean.

## IV. REGULATORY BACKGROUND

### Clean Water Act

13.    CWA section 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge is in compliance with various enumerated CWA sections. Among other things, CWA section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to CWA section 402, 33 U.S.C. § 1342.

14.    CWA section 402(p) requires that NPDES permits be issued for stormwater discharges associated with industrial activities.

15.    CWA section 402(b) allows each state to administer its own EPA-approved permit program for discharges. In California, the State Board and its nine Regional Boards have approval from EPA to administer an NPDES permit program for the State. The State Board and its nine Regional Boards issue individual and general NPDES permits regulating water pollutant discharges from various categories of dischargers.

16.    CWA section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. § 1365(a)(1); *see also* 33 U.S.C. § 1362(5).

17.    CWA section 505(a) authorizes a citizen suit action for injunctive relief. 33 U.S.C. § 1365(a). CWA violators are also subject to an assessment of civil penalties of up to $37,500 per day per violation for violations of the CWA occurring from January 12, 2009 to November 2, 2015 and $51,570 per day per violation for violations occurring after November 2, 2015 and assessed on or after August 1, 2016. *See* 33 U.S.C. § 1319(d) (CWA § 309(d)); 40 C.F.R. § 19.4 (2016) (Adjustment of Civil Monetary Penalties for Inflation).

### State Regulations

18.    The Los Angeles River is heavily degraded from pollutant loading. The EPA, the State

1  Board, and the Los Angeles Regional Water Quality Control Board ("Regional Board") have officially

2  recognized this pollution problem by, *inter alia*, placing the Los Angeles River on the CWA section

3  303(d) list of waters that are so polluted that they do not meet applicable CWA water quality standards.

4  The Regional Board's Basin Plan is the State of California's master policy document setting forth the

5  legal, technical, and programmatic bases of water quality regulation in the Los Angeles Region (Region

6  4). Among other things, the Basin Plan includes the water quality standards/water quality objectives

7  needed to protect the designated beneficial water uses of the Los Angeles River.[2] The Basin Plan sets

8  forth narrative water quality objectives for sediment, settable matter, and suspended materials, as well as

9  narrative objectives for not impairing water quality with oil sheens, turbidity, or other nuisance

10 conditions. The Basin Plan also includes numeric water quality standards for pH, dissolved oxygen,

11 nitrites and nitrates, bacteria, and toxic pollutants as well as site specific objectives for certain pollutants

12 of concern such as cadmium, copper, lead, and zinc.

13     19.     In addition, a rule promulgated by EPA known as the California Toxics Rule ("CTR"), 40

14 C.F.R. § 131.38, sets forth additional CWA water quality standards for 126 toxic priority pollutants in

15 California's rivers, lakes, enclosed bays, and estuaries.[3] The CTR, which applies to the Los Angeles

16 River, includes limits for several toxic metals.

17     **The General Industrial Stormwater Permit**

18     20.     In California, the State Board has elected to issue a single, statewide general permit

19 applicable to all stormwater discharges associated with industrial activity. The Industrial Stormwater

20 Permit is a NPDES permit pursuant to CWA section 402(p), 33 U.S.C. § 1342(p), the current version of

21 which took effect on July 1, 2015. To discharge stormwater lawfully in California, industrial dischargers

22

---

23 [2] The Basin Plan is published by the Regional Board on the internet at:
   https://www.waterboards.ca.gov/losangeles/water_issues/programs/basin_plan/
24  The water quality standards are provided in Chapter 3, available at:
   https://www.waterboards.ca.gov/losangeles/water_issues/programs/basin_plan/2020/Chapter_3/Chapter
25 _3.pdf
   [3] The CTR is explained in the Federal Register preamble accompanying the CTR promulgation set forth
26 at 65 Fed. Reg. 31682.

27

COMPLAINT FOR DECLARATORY          6
AND INJUNCTIVE RELIEF

must secure coverage under the Industrial Stormwater Permit and comply with its terms or obtain and comply with an individual NPDES permit.

21.     It is unlawful to discharge pollutants to waters of the United States, such as the Los Angeles River, without an NPDES permit or in violation of the terms and conditions of an NPDES permit.

22.     On August 11, 2015, American Reclamation submitted a Notice of Intent to be authorized to discharge stormwater from its Facility by the Industrial Stormwater Permit and thus at all relevant times has been a permittee subject to the Industrial Stormwater Permit's requirements.

23.     Other than coverage under the Industrial Stormwater Permit, American Reclamation's Facility lacks NPDES permit authorization for any wastewater discharges.

24.     The Industrial Stormwater Permit contains certain absolute prohibitions. Discharge Prohibition III.B of the Industrial Stormwater Permit prohibits the direct or indirect discharge of materials other than stormwater ("non-stormwater discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. Discharge Prohibition III.C of the Industrial Stormwater Permit prohibits stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance. Receiving Water Limitation VI.B of the Industrial Stormwater Permit prohibits discharges that adversely impact human health or the environment. Receiving Water Limitation VI.A of the Industrial Stormwater Permit prohibits discharges that cause or contribute to an exceedance of any applicable water quality standard contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

25.     In addition to absolute prohibitions, the Industrial Stormwater Permit contains a variety of substantive and procedural provisions with which dischargers must comply. At a minimum, dischargers must employ measures to reduce or eliminate stormwater pollution that constitute the Best Available Technology Economically Achievable ("BAT") and the Best Conventional Pollutant Control Technology ("BCT"). Industrial Stormwater Permit, Effluent Limitation V.A.

26.     Dischargers must develop and implement a Stormwater Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. Industrial Stormwater Permit, X.A. The SWPPP must

identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater and authorized non-stormwater discharges from the facility. *Id.* The SWPPP must identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in stormwater and authorized non-stormwater discharges. *Id.* The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. *Id.*, Effluent Limitation ¶ I.D(32)

27.     The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the stormwater conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution generating activities, nearby water bodies, and pollutant control measures; a description of stormwater management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in stormwater discharges and authorized non-stormwater discharges; the identification and elimination of non-stormwater discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate generating activities; and a description of individuals and their current responsibilities for developing and implementing the SWPPP. *Id.* at X.A.

28.     The Industrial Stormwater Permit also requires facility operators to properly operate and maintain any facilities and systems of treatment and control installed or used to achieve compliance with the conditions of the Industrial Stormwater Permit and requirements of the SWPPP at all times. Industrial Stormwater Permit, XXI.F. The SWPPP and site maps must be assessed and revised as necessary to ensure accuracy and effectiveness. *Id.* at X.B.

29.     Under the 2015 version of the Industrial Stormwater Permit, dischargers are required to prepare and implement a Monitoring Implementation Plan ("MIP") as part of their SWPPP. Industrial Stormwater Permit, Section I. The MIP requirements in the 2015 Permit specify visual observation procedures and locations, sampling procedures, and methods that dischargers must comply with. *Id.*, Sections I, IX. The 1997 Permit's Monitoring and Reporting Program ("MRP") required similar

actions.[4]

30.     Pursuant to the monitoring and reporting requirements of the Industrial Stormwater Permit, facility operators must conduct ongoing visual observations of stormwater and non-stormwater discharges and record responsive measures taken to eliminate unauthorized non-stormwater and to reduce or prevent pollutants in stormwater and authorized non-stormwater discharges. Industrial Stormwater Permit at XI.A.1. Facility operators must collect samples of stormwater discharges from *all* locations where stormwater may be discharged from the facility. *Id.* at XI.B.4. Facility operators must submit Annual Reports to the Regional Board accurately reporting their monitoring activity. *Id.* at XVI.A.

31.     The 2015 Permit incorporates a multiple objective performance measurement system that includes Numeric Action Levels ("NALs"), new comprehensive training requirements, Level 1 Exceedance Response Actions ("ERA Reports"), Level 2 ERA Technical Reports, and Level 2 ERA Action Plans. The 2015 Permit contains two types of NALs: (1) an annual NAL and (2) an instantaneous maximum NAL. WQO-2014-0057-DWQ § XII.A.1. & 2. Dischargers exceed an annual NAL when the average of all their stormwater discharge sampling results within a reporting year for a single parameter (except pH) exceeds the applicable annual NAL. Dischargers exceed an instantaneous maximum NAL when two or more analytical results from their stormwater discharge sampling results for any parameter within a reporting year exceed the applicable instantaneous maximum NAL value. Instantaneous maximum NALs are only for TSS, Oil and Grease, and pH. If dischargers' stormwater discharges exceed these NALs, the 2015 Permit deems dischargers to be in "Level 1 status" and requires such dischargers to complete a Level 1 status evaluation by October 1, 2016 (and annually thereafter so long

---

[4] Under the predecessor versions of the Industrial Stormwater Permit, Facility operators were required to develop and implement a MRP when industrial activities begin at a facility. 1997 Industrial Stormwater Permit at ¶ B.1 and Provision ¶ E.3. The MRP must ensure that stormwater discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Industrial Stormwater Permit. *Id.* at ¶ B.2. The MRP must ensure that practices at the facility to prevent or reduce pollutants in stormwater and authorized non-stormwater discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. *Id.*

as their stormwater discharges continue to exceed NALs) of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s). WQO-2014-0057-DWQ § XII.C.1. Additionally, such dischargers must submit a Level 1 ERA Report to the State Board by January 1, 2017 (and annually thereafter so long as their stormwater discharges continue to exceed NALs and until they have completed ERAs) summarizing their Level 1 status evaluation and describing their revisions to their SWPPPs and any additional BMPs they are implementing. WQO-2014-0057-DWQ § XII.C.2. If a discharger further exceeds NALs while in Level 1 status, then the 2015 Permit assigns the discharger "Level 2 status." WQO-2014-0057-DWQ § XII.D. The 2015 Permit requires dischargers in Level 2 status to develop and implement a Level 2 action plan by January 1 following the discharger acquiring Level 2 status setting forth the measures the discharger will implement to avoid future NAL exceedances. WQO-2014-0057-DWQ § XII.D.1. By the following January 1, the dischargers must further submit a Level 2 technical report analyzing the BMPs implemented and whether these BMPs will avoid NAL exceedances and whether additional BMPs are needed to avoid BMP exceedances. WQO-2014-0057-DWQ § XII.D.2.

32.    On November 6, 2018, the Board approved an amendment to the 2015 Permit (the "2018 Amendment"). These new requirements became effective on July 1, 2020. 2018 Amendment, Attachment E. Any discharges of stormwater after July 1, 2020 with pollutant levels exceeding a Numeric Effluent Limitation ("NEL") or Total Maximum Daily Load ("TMDL") Numeric Action Level ("TNAL") in effect under the 2018 Amendment constitute violations of the General Permit and the CWA.

## V.  **STATEMENT OF FACTS**

33.    In much of the Los Angeles area, stormwater drains untreated either directly, or through the storm drain system, into the Los Angeles River and the Pacific Ocean. With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial facilities, pour into the Los Angeles River and the Pacific Ocean.

34.    American Reclamation operates a recycling facility that is located just south of the Ventura Freeway and is directly adjacent to the Los Angeles River near its confluence with the Verdugo

Wash. As noted, the address for the Facility is 4560 Doran Street, Los Angeles, California.

35.     Activities at the Facility include recycling of construction, demolition, and inert debris ("CDI"), green and wood waste, paper, plastic, and metal; a public buy-back center; a recyclables elevated sorting line; green and wood waste chipping and grinding; paper stock processing; plastic material processing; fueling and maintenance of trucks and equipment; and storage of materials on site to conduct these activities. The operations at the Facility, including loading, unloading, sorting, grinding, washing, construction, demolition, moving, and storage of industrial materials, occur, at least in part, outdoors and cause pollutants to be exposed to rainfall. With the exception of the public buy-back center, all materials at the Facility are received, handled, and stored outdoors, and, on information and belief, some truck and equipment maintenance and refueling takes place at the Facility without cover as well. Stormwater comes into contact with pollutants at the Facility. Dust, debris, and residues are also tracked from the covered areas and by operational equipment to other areas, including adjoining public streets, that contact stormwater.

36.     Discharges of stormwater flow off the Facility at two discharge points that then discharge directly into the Los Angeles River, Reach 3.

37.     The Industrial Stormwater Permit requires a discharger to monitor additional parameters if the discharge(s) from its facility contributes pollutants to receiving waters that the State Board and the EPA have listed as impaired for those pollutants pursuant to CWA section 303(d). *See* 2015 Permit § VI. A-C and VII.B. Reach 3 of the Los Angeles River is listed as impaired for trash, ammonia, copper, nutrients (algae), toxicity, and bacteria.

38.     The Facility lacks sufficient and/or sufficiently well-maintained berms or other structural controls to retain stormwater on the Facility. American Reclamation does not sufficiently treat contaminated stormwater prior to discharge from the Facility.

39.     The types of pollutants that the Facility releases into the immediate environment include, among others: dust; toxic metals such as cadmium, copper, lead, aluminum, iron, and zinc; oil and grease; nitrites and nitrates; bacteria, including total coliform and *E. coli*; and TSS and pH-affecting substances. The industrial materials stored, and the pollutants generated, at the Facility are exposed to

stormwater flows.

**American Reclamation Activities Contributing to CWA Violations**

40.     American Reclamation has not developed and/or implemented an adequate SWPPP at the Facility in accord with Section A: Stormwater Pollution Prevention Plan Requirements, ¶ 1 of the 1997 Permit; and by Section X.A-I. of the 2015 Permit.

41.     American Reclamation has failed to prepare, maintain, revise, and implement its SWPPP as required, as evidenced by American Reclamation's stormwater discharges in excess of EPA and State benchmarks.

42.     American Reclamation's SWPPP does not identify and evaluate all sources of pollutants that may affect the quality of industrial stormwater discharges and authorized non-stormwater discharges. WQO-2014-0057-DWQ §§ X.C.1.A., X.G.2. The SWPPP must describe each industrial process and the "type, characteristics, and approximate quantity of industrial materials used in or resulting from" industrial processes. WQO-2014-0057-DWQ § X.G.1.A. Dischargers must also ensure their SWPPP describes all activities that generate a significant amount of dust or particulate that may be deposited within the facility boundaries, including the locations, source, and characteristics of the dust or particulate pollution. WQO-2014-0057-DWQ, X.G.1.C. American Reclamation's SWPPP fails to describe the approximate quantity of industrial materials used in or resulting from industrial processes as required by WQO-2014-0057-DWQ § X.G.1.A and the characteristics of metal particulates, materials creating COD, *E. coli*, and total coliform bacteria present on-site and where generated as required by WQO-2014-0057-DWQ, X.G.1.A., C.

43.     American Reclamation's SWPPP does not specify adequate BMPs designed to reduce pollutant discharge to BAT and BCT levels in accord with Section A: SWPPP Requirements, ¶ 8 of the 1997 Permit and Section X.A-I. of the 2015 Permit as evidenced by the Facility's continued discharge of stormwater contaminated above pollutant levels attainable via application of BAT and BCT.

44.     American Reclamation has not implemented BMPs that adequately minimize the exposure of pollutants at the Facility to stormwater. American Reclamation has not implemented BMPs at the Facility that adequately control and minimize contaminated runoff from the Facility.

COMPLAINT FOR DECLARATORY                    12
AND INJUNCTIVE RELIEF

45.     American Reclamation has not implemented BMPs at the Facility that adequately treat and remove pollutants in stormwater prior to discharge.

46.     American Reclamation has not adequately evaluated and revised its SWPPP for the Facility to address these failures. American Reclamation has also failed to fully implement its SWPPP and properly operate and maintain the structures and systems that have been put in place to achieve compliance with the Industrial Stormwater Permit and SWPPP requirements.

47.     American Reclamation has consistently discharged stormwater from the Facility during all rain events sufficient to generate stormwater runoff (i.e., storm events equaling or exceeding 0.1 inch of precipitation) that have contained pollutant levels in excess of NALs and NELs as set forth in Attachment 1. Should American Reclamation continue to discharge stormwater with similar levels of pollutants as in the past, then it will in the future violate the NELs for the Los Angeles River watershed for nitrate-nitrogen, nitrite-nitrogen, nitrate + nitrite nitrogen, ammonia, cadmium, copper, lead, and zinc established by the State Board and Regional Board to be effective as of July 1, 2020.

48.     American Reclamation has not prepared an adequate site map for the Facility, thereby failing to comply with the 2015 Permit (*See, e.g.,* WQO-2014-0057-DWQ §§ X.E., X.G.1.d). For example, the Facility site map fails to identify: the locations of downspouts that are part of stormwater conveyance systems, the locations where American Reclamation places BMP measures such as straw wattles, the location of a pass through drain to the Los Angeles River at the end of the Doran Street cul-de-sac, locations where significant spills or leaks have occurred on the Facility in the past, all the areas of the Facility exposed to precipitation, the locations of liquid flows during dry weather and the nature of these liquid flows, the locations where American Reclamation conducts truck repair and fueling not under cover, the areas where American Reclamation dumps construction materials as a source of dust or particulate generation (which they obviously are), and the various piles of material stored outdoors as potential pollutant sources.

49.     Though American Reclamation continues to fail to comply with the Industrial Stormwater Permit, it has not properly revised its SWPPP to bring it into compliance. The 2015 Permit requires dischargers to revise their SWPPPs whenever necessary to ensure permit compliance. 2015

Permit § X.B.1. The 2015 Permit further requires dischargers to perform an annual comprehensive facility compliance evaluation every reporting year (July 1 to June 30) and revise their SWPPPs to reflect any changes to BMPs or other measures as shown warranted by this compliance evaluation. 2015 Permit § XV. American Reclamation has not carried out these analyses and revisions as required to address and eliminate the identified inadequacies of its SWPPP. For example, American Reclamation has failed to modify its SWPPP to specify the new BMPs specified in its Exceedance Response Actions Reports ("ERA Reports") or Exceedance Response Action Plans. Further, American Reclamation failed to perform an adequate annual comprehensive facility compliance evaluation each year since 2016. Finally, American Reclamation's SWPPP states "There are currently no TMDLs this facility is required to comply with." This is no longer accurate as the State Board and EPA have adopted Total Maximum Daily Loads for the Los Angeles River that the Facility discharges to for nitrogen compounds, bacteria, and various metals. However, American Reclamation has not updated its SWPPP to reflect this change.

50.    American Reclamation has not developed and/or implemented an adequate MIP/MRP at the Facility.

51.    American Reclamation's monitoring and reporting activities have not resulted in practices that adequately reduce or prevent pollutants from discharging into stormwater flows from the Facility.

52.    American Reclamation has failed to complete all of the stormwater sampling required by the Industrial Stormwater Permit at the Facility. This includes failures to sample during required rain events, failures to sample an adequate number of Qualifying Storm Events ("QSEs"), sampling non-QSE discharges, failures to sample all discharge locations, failures to sample using proper sampling methodologies, and failures to analyze samples taken for required pollutants.

53.    American Reclamation's monitoring activities have not effectively identified compliance problems at the Facility or resulted in effective revision of its SWPPP.

54.    American Reclamation has not submitted accurate and complete Annual Reports in compliance with 2015 Permit § XVI.

55.    Due to American Reclamation's lack of effective pollution prevention measures, its

COMPLAINT FOR DECLARATORY          14
AND INJUNCTIVE RELIEF

1  failure to implement effective best management practices, its failure to implement an effective

2  monitoring and reporting program, and its other violations of the CWA, stormwater from the Facility

3  becomes polluted with many constituents. Dust; toxic metals such as cadmium, copper, lead, aluminum,

4  iron, and zinc; nitrites and nitrates; bacteria such as *E. Coli* and total coliform; and TSS and pH-

5  affecting substances become entrained in stormwater when such water flows over and across the outdoor

6  processing areas of the Facility. This polluted stormwater is discharged to the Los Angeles River, which

7  then flows into the Pacific Ocean.

8         56.    American Reclamation's own stormwater sampling indicates that American

9  Reclamation's discharges of stormwater from the Facility are consistently contaminated with higher

10  levels of pollutants than is permissible under the Industrial Stormwater Permit.

11

12                                **FIRST CLAIM FOR RELIEF**

13        **Discharges in Violation of Technology-Based Effluent Limitations**
          **(Violations of 33 U.S.C. § 1311)**

14         57.    Plaintiff repeats and incorporates by reference the allegations in the above paragraphs and

15  all paragraphs of this Complaint.

16         58.    The CWA provides that "the discharge of any pollutant by any person shall be unlawful"

17  unless the discharger is in compliance with the terms of a NPDES permit. CWA § 301(a), 33 U.S.C. §

18  1311(a); *see also* CWA § 402(p), 33 U.S.C. § 1342(p) (requiring NPDES permit issuance for the

19  discharge of stormwater associated with industrial activities). The Facility discharges stormwater

20  associated with industrial activity to the Los Angeles River and the Pacific Ocean, both of which are

21  contaminated with pollutants. The Facility discharges stormwater pursuant to the Industrial Stormwater

22  Permit, which authorizes these discharges conditioned on the Facility complying with the terms of the

23  Industrial Stormwater Permit. Each of these permit terms constitutes an "effluent limitation" within the

24  meaning of CWA section 505(f), 33 U.S.C. § 1365(f). The Facility's stormwater discharges have

25  violated numerous of these permit terms, thereby violating CWA effluent limitations.

26         59.    The Effluent Limitations of the 2015 Permit, § V.A. prohibit the Facility from

27  discharging pollutants above the level commensurate with the application of BAT and BCT. On every

day the Facility has existed since at least July 15, 2015, American Reclamation has been discharging polluted stormwater from the Facility containing levels of pollutants above the level commensurate with the application of BAT and BCT in violation of the Effluent Limitations of the Industrial Stormwater Permit during every significant rain event (defined by EPA as a rainfall event generating 0.1 inches or more of rain). Significant local rain events are reflected in the rain gauge data available at https://www.ncdc.noaa.gov/cdo-web/search. Attachment 2 set forth at the conclusion of this Complaint lists the rainfall data since October 2015 as reported to the Burbank Glendale Pasadena Airport monitoring station, the closest monitoring station available on the NOAA website.

60.    EPA and the State Board have published Benchmark Values set at the maximum level of pollutant loading generally expected if an industrial facility is employing BAT and BCT (which are set forth in the tables included in Attachment 1 set forth at the end of this Complaint). In the 2015 Permit, the State Board has established NALs (set forth in the tables included in Attachment 1 set forth at the end of this Complaint) that serve a similar purpose.

61.    As reflected in Attachment 1, the Facility has repeatedly discharged stormwater from the discharge locations ("outfalls") identified in its SWPPP containing pollutant levels exceeding these Benchmark Values and NALs, which establishes that the Facility has discharged pollutants above a level commensurate with application of BAT and BCT. Attachment 1 compiles some of the self-monitoring data reported by the Facility to the Regional Board reflecting the Facility's sampling of actual stormwater discharges. Attachment 1 also includes the results of sampling carried out by LA Waterkeeper. The sample results reflected in Attachment 1 are representative of the pollutant levels in the Facility's discharge of stormwater, including such discharges that American Reclamation did not sample or analyze. Thus, every instance when the Facility has discharged stormwater, including instances when the Facility has discharged stormwater that it has not sampled, this stormwater discharge has contained levels of pollutants comparable to the levels set forth in Attachment 1. Such polluted stormwater discharges from the Facility have occurred during every significant rain event during which the Facility has existed since at least July 1, 2015.

62.    LA Waterkeeper further alleges that on each day that American Reclamation has

COMPLAINT FOR DECLARATORY                16
AND INJUNCTIVE RELIEF

discharged stormwater, American Reclamation has discharged stormwater that was not treated to a level commensurate with BAT or BCT in violation of the 2015 Permit, § V.A. because, as further alleged in the Third Claim, below, American Reclamation has not developed and implemented a SWPPP that mandates BMPs that are commensurate with BAT and BCT for the Facility.

63.     Unlawful discharges of stormwater from the Facility with levels of pollutants exceeding BAT and BCT levels of control continue to occur presently and will occur in the future during all significant rain events.

64.     Each discharge of stormwater from the Facility after the effective date of the Industrial Stormwater Permit has constituted and will constitute a separate violation of the Industrial Stormwater Permit's Effluent Limitations and the CWA. Every day since at least five years and sixty days before the date Plaintiff filed this Complaint that American Reclamation has discharged or will discharge polluted stormwater from the Facility in violation of the Effluent Limitations of the 2015 Permit, § V.A. is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a) which subjects American Reclamation to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

## SECOND CLAIM FOR RELIEF

### Discharges of in Violation of Water Quality-Based Effluent Limitations
### (Violations of 33 U.S.C. § 1311)

65.     Plaintiff repeats and incorporates by reference the allegations in the above paragraphs and all paragraphs of this Complaint.

66.     The Discharge Prohibitions of the Industrial Stormwater Permit, III.C, prohibit stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance. The Receiving Water Limitations of the Industrial Stormwater Permit, VI.B, prohibit stormwater discharges to surface or groundwater that adversely impact human health or the environment. The Receiving Water Limitations of the Industrial Stormwater Permit, VI.A, prohibit stormwater discharges that cause or contribute to an exceedance of applicable Water Quality Standards. Applicable Water Quality Standards are set forth in the Basin Plan and the CTR.

The Basin Plan, *inter alia*, establishes the following Water Quality Standards for the Los Angeles River:

a. Waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses. Basin Plan at 3-38.

b. Waters shall not contain suspended or settleable material in concentrations that cause nuisance or adversely affect beneficial uses. *Id.* at 3-37.

c. Waters shall not contain oils, greases, waxes or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses. *Id.* at 3-29.

d. The pH of inland surface waters shall not be depressed below 6.5 or raised above 8.5 as a result of waste discharges. Ambient pH levels shall not be changed more than 0.5 units from natural conditions as a result of waste discharge. *Id.* at 3-35.

67.     The Basin Plan further establishes numeric water quality criteria for copper, lead, zinc, cadmium, nitrate, nitrate + nitrite (sum as nitrogen), and coliform and *E. coli* bacteria.

68.     The CTR establishes a freshwater continuous concentration criterion limit for zinc of 120 micrograms per liter.

69.     American Reclamation's discharges of stormwater from the Facility from discharge locations ("outfalls") identified in American Reclamation's SWPPP have caused or contributed to an exceedance of one or more of the above-listed Water Quality Standards. Attachment 1 compiles some of the self-monitoring data reported by the Facility to the Regional Board reflecting the Facility's sampling of stormwater discharges and independent sampling carried out by LA Waterkeeper. The sample results reflected in Attachment 1 are representative of the pollutant levels in the Facility's discharge of stormwater, including such discharges that American Reclamation did not sample or analyze. Thus, every instance when the Facility has discharged stormwater, including instances when the Facility has discharged stormwater that American Reclamation has not sampled, this stormwater discharge has contained levels of pollutants comparable to the levels set forth in Attachment 1. Attachment 1 indicates that the Facility routinely discharges stormwater to the Los Angeles River

containing, *inter alia*, the following pollutants: zinc, cadmium, iron, copper, lead, oil and grease, aluminum, nitrates and nitrites, bacteria (including total coliform and *E. coli*), and total suspended solids. The levels of these pollutants in the Facility's stormwater discharges have caused pollution, contamination, or nuisance in violation of the Discharge Prohibitions of the Industrial Stormwater Permit, III.C and have adversely impacted the environment in violation of the Receiving Water Limitations of the Industrial Stormwater Permit, VI.B. Moreover, the discharge of these pollutants has caused the Los Angeles River not to attain or has contributed to these waters not attaining one or more applicable CWA water quality standards in violation of the Receiving Water Limitations of the Industrial Stormwater Permit, VI.A.

70.     Specifically, the Facility's discharge of excessive TSS has caused or contributed to the Los Angeles River, Reach 3, not meeting applicable water quality standards in the Basin Plan for levels of suspended sediment and turbidity. The Facility's discharge of stormwater containing suspended and settleable toxic metals and other materials has contributed to the deposition and/or dispersal of materials that interfere with beneficial uses of the Los Angeles River and a detrimental increase in concentrations of toxic substances found in bottom sediments or aquatic life due to bioaccumulation. The Facility's discharges of zinc, iron, and aluminum have caused the Los Angeles River to exceed water quality standards established by the CTR and Basin Plan for these pollutants.

71.     LA Waterkeeper alleges and puts American Reclamation on notice that each day that American Reclamation discharged stormwater from the Facility, American Reclamation's stormwater contained levels of pollutants on par with the levels set forth in Attachment 1 and thus caused levels of pollutants to exceed one or more of the applicable Water Quality Standards in the Los Angeles River. Every day that the Facility has been in existence since the effective date of the above-referenced water quality standards, which date back at least to 1986 in most instances and to May 24, 2000 for the CTR's limit on copper, lead, and zinc, American Reclamation has discharged stormwater from the Facility during at least every significant local rain event over 0.1 inches that has caused or contributed to Water Quality Standards not being met in the Los Angeles River. Significant local rain events are reflected in the rain gauge data available at https://www.ncdc.noaa.gov/cdo-web/search. Attachment 2

lists the rainfall data since October 2015 as reported to the Burbank Glendale Pasadena Airport monitoring station, the closest monitoring station available on the NOAA website.

72.    American Reclamation's unlawful discharges from the Facility continue to occur presently and will occur in the future during all significant rain events. Each discharge of stormwater from the Facility after the effective date of the Industrial Stormwater Permit has constituted and will constitute a separate violation of the Discharge Prohibitions of the 2015 Permit, III.C and/or the Receiving Water Limitations of the 2015 Permit, VI.A and B and the CWA. Every day since five years and sixty days before the date Plaintiff filed this Complaint that American Reclamation has discharged or will discharge polluted stormwater from the Facility in violation of Discharge Prohibitions of the 2015 Permit, III.C and/or the Receiving Water Limitations of the 2015 Permit, VI.A and B is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a) that subjects American Reclamation to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

### THIRD CLAIM FOR RELIEF

**Failure to Develop and Implement an Adequate Stormwater
Pollution Prevention Plan
(Violations of 33 U.S.C. § 1311)**

73.    Plaintiff repeats and incorporates by reference the allegations in the above paragraphs and all paragraphs of this Complaint.

74.    American Reclamation has failed to develop and implement an adequate SWPPP or implement all necessary revisions to the SWPPP for the Facility, including specifying minimum BMPs and additional advanced BMPs. 2015 Permit § X.A-I.

75.    American Reclamation has failed to prepare, maintain, revise, and implement American Reclamation's SWPPP as required, as evidenced by stormwater discharges that exceed EPA and State benchmarks and contribute to violations of Water Quality Standards in receiving waters. American Reclamation's SWPPP does not specify adequate BMPs designed to reduce pollutant discharge to BAT and BCT levels in accord with Section X.A-I. of the 2015 Permit as evidenced by the Facility's continued discharge of stormwater contaminated above pollutant levels attainable via application of

BAT and BCT.

76.     American Reclamation's SWPPP does not identify and evaluate all sources of pollutants that may affect the quality of industrial stormwater discharges and authorized non-stormwater discharges. WQO-2014-0057-DWQ §§ X.C.1.A., X.G.2. The SWPPP must describe each industrial process and the "type, characteristics, and approximate quantity of industrial materials used in or resulting from" industrial processes. WQO-2014-0057-DWQ § X.G.1.A. Dischargers must also ensure their SWPPP describes all activities that generate a significant amount of dust or particulate that may be deposited within the facility boundaries, including the locations, source, and characteristics of the dust or particulate pollution. WQO-2014-0057-DWQ, X.G.1.C. American Reclamation's SWPPP fails to describe the approximate quantity of industrial materials used in or resulting from industrial processes as required by WQO-2014-0057-DWQ § X.G.1.A and the characteristics of metal particulates, materials creating COD, *E. coli*, and total coliform bacteria present on-site and where generated as required by WQO-2014-0057-DWQ, X.G.1.A., C.

77.     American Reclamation has not prepared an adequate site map for the Facility, thereby failing to comply with the 2015 Permit (*See, e.g.,* WQO-2014-0057-DWQ §§ X.E., X.G.1.d). For example, the Facility site map fails to identify: the locations of downspouts that are part of stormwater conveyance systems, the locations where American Reclamation places BMP measures such as straw wattles, the location of a pass through drain to the Los Angeles River at the end of the Doran Street cul-de-sac, locations where significant spills or leaks have occurred on the Facility in the past, all the areas of the Facility exposed to precipitation, the locations of liquid flows during dry weather and the nature of these liquid flows, the locations where American Reclamation conducts truck repair and fueling not under cover, the areas where American Reclamation dumps construction materials as a source of dust or particulate generation (which they obviously are), and the various piles of material stored outdoors as potential pollutant sources.

78.     Though American Reclamation continues to fail to comply with the Industrial Stormwater Permit, it has not properly revised its SWPPP to bring it into compliance. The 2015 Permit requires dischargers to revise their SWPPPs whenever necessary to ensure permit compliance. 2015

Permit § X.B.1. The 2015 Permit further requires dischargers to perform an annual comprehensive facility compliance evaluation every reporting year (July 1 to June 30) and revise their SWPPPs to reflect any changes to BMPs or other measures as shown warranted by this compliance evaluation. 2015 Permit § XV. American Reclamation has not carried out these analyses and revisions as required to address and eliminate the identified inadequacies of its SWPPP. For example, American Reclamation has failed to modify its SWPPP to include the new BMPs specified in its Exceedance Response Actions Reports ("ERA Reports") or Exceedance Response Action Plans. Further, American Reclamation failed to perform an adequate annual comprehensive facility compliance evaluation each year since 2016. Finally, American Reclamation's SWPPP states "There are currently no TMDLs this facility is required to comply with." This is no longer accurate as the State Board and EPA have adopted TMDLs for the Los Angeles River that the Facility discharges to for nitrogen compounds, bacteria, and various metals. However, American Reclamation has not updated its SWPPP to reflect this change into specified BMPs to comply with these TMDLs.

79.    American Reclamation further has failed to revise its SWPPP to account for the State Board and Regional Board establishing NELs for the Los Angeles River watershed for nitrate-nitrogen, nitrite-nitrogen, nitrate + nitrite nitrogen, ammonia, cadmium, copper, lead, and zinc.

80.    American Reclamation's failures to draft an adequate SWPPP, and/or to revise, and/or to implement American Reclamation's SWPPP in all the above respects are in violation of the requirements of Section X of the 2015 Permit. American Reclamation was required to have prepared and implemented an adequate SWPPP by no later than July 1, 2015 pursuant to Section X of the 2015 Permit. Therefore, American Reclamation has been in daily and continuous violation of the Industrial Stormwater Permit's requirement to develop and implement an adequate SWPPP for the Facility on each and every day since July 1, 2015 that American Reclamation has maintained the Facility. American Reclamation will continue to be in violation every day that American Reclamation fails to develop and implement an adequate SWPPP.

81.    Every day since July 1, 2015 that American Reclamation has failed to draft an adequate SWPPP, and/or to revise, and/or to implement American Reclamation's SWPPP in violation of the

requirements of Section X of the current Industrial Stormwater Permit is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a), which subjects American Reclamation to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

## FOURTH CLAIM FOR RELIEF

### Failure to Develop and Implement an Adequate
### Monitoring and Implementation Program
### (Violations of 33 U.S.C. § 1311)

82.     Plaintiff repeats and incorporates by reference the allegations in the above paragraphs and all paragraphs of this Complaint.

83.     American Reclamation has failed to develop and implement an adequate monitoring and implementation program ("MIP") and implement all necessary revisions to the MIP at the Facility as required by the 2015 Permit, WQO-2014-0057-DWQ § XI.

84.     American Reclamation is required to comply with the Industrial Stormwater Permit's requirements concerning the timing of American Reclamation's sampling events and the outfalls American Reclamation must sample. American Reclamation is further required to comply with the provisions in American Reclamation's SWPPP concerning the outfalls American Reclamation must sample and the pollutants American Reclamation must analyze. Any failure to comply with an SWPPP also constitutes a violation of Section X.A of the 2015 Permit.

85.     The 2015 Permit provides that the discharger shall certify and submit via the State Board's Stormwater Multiple Application and Report Tracking System ("SMARTS") an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS. 2015 Permit, XVI. The permit further provides that "the Discharger shall include in the Annual Report: 1. A Compliance Checklist that indicates whether a Discharger complies with, and has addressed all applicable requirements of this General Permit; 2. An explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist; 3. An identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year; and, 4. The date(s) of the Annual Evaluation."

COMPLAINT FOR DECLARATORY                23
AND INJUNCTIVE RELIEF

86. American Reclamation has not submitted accurate and complete Annual Reports in compliance with 2015 Permit § XVI.

87. American Reclamation's SWPPP provides that it must collect and analyze stormwater samples from two qualifying storm events ("QSEs") within the first half of each reporting year (July 1 to December 31) and 2 QSEs within the second half of each reporting year (January 1 to June 30), for a total of four samples, as required by the 2015 Permit. While there have been several qualifying storm events in the past 5 years and beyond (*see* Attachment 2), American Reclamation has failed to sample the required number of stormwater discharges during these events, in violation of the Industrial Stormwater Permit. American Reclamation has also failed to sample during required rain events, failed to sample an adequate number of QSEs, sampled non-QSE discharges, failed to sample all discharge locations, failed to sample using proper sampling methodologies, and failed to analyze samples taken for required pollutants. For example, American Reclamation collected and provided to the laboratory for analysis a sample stored in a trash bag and failed to deliver samples to the laboratory with the required preservative treatment. The results of American Reclamation's sampling documented in Attachment 1 further are widely divergent from the results obtained by LA Waterkeeper when it took samples from the Facility, with levels of pollutants substantially lower. On information and belief, American Reclamation is failing to adhere to appropriate sampling methodologies such that it is getting results that are inaccurate of the levels of pollutants in American Reclamation's stormwater. American Reclamation is engaging in practices systematically skewed to present lower levels of pollutants in its storm water samples (such as by failing to preserve samples). American Reclamation also failed to provide stormwater sampling results to the State Board, and on information and belief failed to sample stormwater discharges from the Facility, in December 2020 and January 2021 despite Attachment 2 indicating that there were QSEs that American Reclamation should have sampled in those months.

88. The 2015 Permit requires that American Reclamation's MIP must provide for analysis of stormwater samples for TSS, pH, and total oil and grease. 2015 Permit § XI.B.6. In addition, the 2015 Permit requires that American Reclamation's MIP provide for analysis of stormwater samples for the other analytical parameters set out in the 2015 Permit under Table 1. American Reclamation's

SWPPP indicates that its SIC code is 5093, which would obligate it under this 2015 Permit Table 1 to analyze stormwater samples for iron, lead, aluminum, zinc, and chemical oxygen demand ("COD"). The 2015 Permit § XI.B.6.c. further requires American Reclamation to analyze its stormwater for the presence of pollutants related to approved TMDLs. The pollutants include cadmium, copper, nitrate + nitrite nitrogen, *E. coli* bacteria, and total coliform bacteria. American Reclamation's SWPPP/MIP indicates that American Reclamation will analyze its stormwater discharges only for the following pollutants: TSS, oil and grease, pH, total copper, nitrate, nitrite, total nitrogen ("N+N"), total zinc, and total lead. American Reclamation's SWPPP/MIP has failed to specify analysis of stormwater discharges for the presence of iron, aluminum, COD, cadmium, *E. coli* bacteria, and total coliform bacteria.

89.    American Reclamation has failed to implement its MIP and/or a MIP that would be compliant with the Industrial Stormwater Permit. The 2015 Permit requires American Reclamation to analyze its samples at least for all of the pollutant parameters identified in its SWPPP. 2015 Permit, XI.B(6). American Reclamation has not analyzed all of its stormwater discharge samples for the presence of the pollutant parameters listed in its SWPPP. Additionally, American Reclamation has not analyzed all of its stormwater discharge samples for the presence of iron, aluminum, cadmium, *E. coli* bacteria, and total coliform bacteria.

90.    As alleged in the preceding paragraphs, American Reclamation has not developed and implemented an adequate MIP. American Reclamation was required to have prepared and implemented an adequate MIP by no later than July 1, 2015 by the 2015 Permit. WQO-2014-0057-DWQ, § XI. Therefore, American Reclamation has been in daily and continuous violation of the monitoring and reporting requirements of the Industrial Stormwater Permit every day since July 1, 2015 (or whenever the Facility began operation, whichever is later). Therefore, American Reclamation will also continue to be in violation every day after July 1, 2015 that it fails to develop and implement an adequate MIP for the Facility. American Reclamation is subject to penalties for violations of the Industrial Stormwater Permit and the CWA occurring within the past five (5) years and sixty (60) days.

91.    As further discussed above, American Reclamation has not submitted accurate and

complete Annual Reports and reports of American Reclamation's noncompliance with the Industrial Stormwater Permit. Therefore, American Reclamation has been in daily and continuous violation of the reporting requirements of the 2015 Industrial Stormwater Permit, Section XVI every day since each of American Reclamation's Annual Reports were due.

92.     Every day since July 1, 2015 that American Reclamation has failed to prepare and implement an adequate MIP as required by the 2015 Permit, Section XVI, is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a). American Reclamation is subject to assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365, for all such violations occurring within five years and sixty days since Plaintiff filed this Complaint.

## FIFTH CLAIM FOR RELIEF

**Failure to Develop and Implement Adequate Exceedance Response Action Reports, Plans, and Technical Reports
(Violations of 33 U.S.C. § 1311)**

93.     Plaintiff repeats and incorporates by reference the allegations in the above paragraphs and all paragraphs of this Complaint.

94.     American Reclamation has failed to develop and implement adequate Level 1 ERA Reports, Level 2 ERA Actions Plans, and Level 2 ERA Technical Reports despite its continued failure to meet NALs.

95.     Attachment 1 shows that American Reclamation's stormwater has regularly exceeded the annual NALs for aluminum (2012-13, 2013-14, 2014-15 (if the stormwater sample gathered in a trash bag is omitted), 2015-16, and 2019-20), copper (2012-13, 2013-14, 2015-16, 2017-18, 2018-19, and 2019-20), iron (2012-13, 2013-14, 2014-15, 2015-16, 2017-18, and 2019-20), and zinc (2012-13, 2013-14, 2015-16, 2016-17, 2017-18, and 2019-20) and the instantaneous NAL for TSS (2019-20). LA Waterkeeper's sampling, summarized in Attachment 1, further indicates exceedance of NALs for N/N, lead, and cadmium that American Reclamation's testing has failed to identify.

96.     If dischargers' stormwater discharges exceed NALs, the 2015 Permit deems dischargers to be in "Level 1 status" and requires such dischargers to complete a Level 1 status evaluation by

October 1, 2016 (and annually thereafter so long as their stormwater discharges continue to exceed NALs) of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s). WQO-2014-0057-DWQ § XII.C.1. Additionally, such dischargers must submit a Level 1 ERA Report to the State Board by January 1, 2017 (and annually thereafter so long as their stormwater discharges continue to exceed NALs and until they have completed ERAs) summarizing their Level 1 status evaluation and describing their revisions to their SWPPPs and any additional BMPs they are implementing. WQO-2014-0057-DWQ § XII.C.2. If a discharger further exceeds NALs while in Level 1 status, then the 2015 Permit assigns the discharger "Level 2 status." WQO-2014-0057-DWQ § XII.D. The 2015 Permit requires dischargers in Level 2 status to develop and implement a Level 2 action plan by January 1 following the discharger acquiring Level 2 status setting forth the measures the discharger will implement to avoid future NAL exceedances. WQO-2014-0057-DWQ § XII.D.1. By the following January 1, the dischargers must further submit a Level 2 technical report analyzing the BMPs implemented and whether these BMPs will avoid NAL exceedances and whether additional BMPs are needed to avoid BMP exceedances. WQO-2014-0057-DWQ § XII.D.2. The purpose of these measures is to bring pollutant levels in stormwater discharges below the NALs.

97.     Due to its exceedance of NALs for aluminum, copper, iron, and zinc in the 2015-16 reporting year, the Facility entered Level 1 status. American Reclamation prepared a Level 1 ERA Report in December 2016. This December 2016 Level 1 ERA Report specified that the Facility would continue to implement existing BMPs, such as visual inspections of truck paths, maintenance areas, and wash activities; halting outdoor maintenance during rain events; wash rack cleaning; keeping up with vehicle maintenance; maintaining the CDI bunker in good working condition; manual site sweeping; litter patrol; and use of absorbents to clean up fluids. For new BMPs, American Reclamation indicated it would install several Filtrexx® Envirosoxx® to decrease the potential for these pollutants to contribute to the site's surface water run-off quality. However, American Reclamation either failed to implement these BMPs properly or these BMPs proved to be inadequate as the levels of pollutants in American Reclamation's stormwater discharges remained elevated above NALs.

98.     In the 2016-17 reporting year, the level of zinc in the Facility's stormwater discharges

continued to exceed annual average NALs, placing the Facility into Level 2 status. In the 2017-18 reporting year, the level of zinc in the Facility's stormwater discharges continued to exceed the annual average NAL, continuing to place the Facility in Level 2 status. In 2017-2018 the levels of copper and iron in the Facility's stormwater discharges also exceeded the annual average NAL, placing the Facility in Level 1 status for these pollutants. American Reclamation prepared a series of Level 2 ERA Action Plans. The last of these, revised December 2018, indicated that in addition to continuing existing BMPs, American Reclamation would install a Kristar FloGard downspout filter, or Earth Lite Rain Clear CFS, or other similar treatment system (e.g., additional placement of Filtrexx Siltsoxx) at the Metal Yard and Paper Yard roof downspout. However, American Reclamation failed to modify its SWPPP to specify these new BMPs as required by the Permit. In addition, American Reclamation either failed to implement these new BMPs properly or these BMPs proved to be inadequate as the levels of zinc in its stormwater discharges remained elevated in the 2019-20 reporting year, continuing to place the Facility in Level 2 status. Also, some of American Reclamation's ERA reports list the construction of a 48,000 square foot building on the property as a BMP measure (the building is also identified in American Reclamation's 2014 site plan). However, on information and belief from review of available information, it does not appear that that this building was actually constructed. American Reclamation either failed to implement these BMPs properly or these BMPs proved to be inadequate as the levels of pollutants in American Reclamation's stormwater discharges remained elevated above NALs.

99.     In addition, in the 2018-2019 reporting year, the levels of nitrate + nitrite nitrogen, copper, and iron in the Facility's storm water discharges exceeded annual average NALs, placing the Facility into Level 1 status for nitrate + nitrite nitrogen and iron and Level 2 status for copper. However, American Reclamation has not implemented the required Level 1 ERA Report for nitrate + nitrite nitrogen and iron or the Level 2 ERA action plan for copper, in violation of the Permit requirement to do so.

100.     In the 2019-2020 reporting year, levels of aluminum, copper, iron, zinc, and TSS in the Facility's stormwater discharges exceeded annual average and instantaneous average NALs, placing the Facility into Level 1 status for aluminum, zinc, and TSS and maintaining Level 2 status for copper and

iron. In addition, LA Waterkeeper's sampling indicates additional NAL exceedances of N/N, lead, and cadmium that American Reclamation's testing has failed to identify. However, American Reclamation has not complied with its Level 1 or Level 2 ERA duties for 2019-2020 for these pollutants, in violation of the Permit requirement to do so.

101.    The above sampling results indicate that American Reclamation's stormwater regularly exceeded the NAL limits both before and after the limitations went into effect. American Reclamation has prepared various Level 1 and Level 2 ERA filings, but its stormwater has continued to contain pollution levels that exceed the NALs. In addition, American Reclamation has failed to prepare various required Level 1 and Level 2 ERA filings. As a result, American Reclamation has failed to prepare adequate ERA Reports, Plans, and Technical Reports to prevent pollutant discharges in excess of NALs and/or has failed to adequately implement its ERA Reports, Plans, and Technical Reports to prevent pollutant discharges in excess of NALs.

102.    Every day since July 1, 2015 that American Reclamation has failed to prepare and implement adequate ERA Reports, Plans, and Technical Reports as required by the 2015 Permit, Section XII, is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a). American Reclamation is subject to assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365, for all such violations occurring within five years and sixty days since Plaintiff filed this Complaint.

## SIXTH CLAIM FOR RELIEF

### Discharge in Violation of Numeric Effluent Limitations
### (Violations of 33 U.S.C. § 1311)

103.    Prior to July 1, 2020, American Reclamation has consistently discharged stormwater from the Facility during all rain events sufficient to generate stormwater runoff (i.e., storm events equaling or exceeding 0.1 inch of precipitation) that have continued pollutant levels in excess of NELs as set forth in Attachment 1. Should American Reclamation continue to discharge stormwater with similar levels of pollutants as in the past, then it will in the future violate the NELs for the Los Angeles River watershed for nitrate-nitrogen, nitrite-nitrogen, nitrate + nitrite nitrogen, ammonia, cadmium,

copper, lead, and zinc established by the State Board and Regional Board to be effective as of July 1, 2020.

104.    Every day after July 1, 2020 that American Reclamation discharges stormwater that contains pollutants exceeding NELs established by the 2018 Amendment is or will constitute a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a). American Reclamation is subject to assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365, for all such violations.

105.    An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged in LA Waterkeeper's First through Sixth Claims above will irreparably harm LA Waterkeeper and LA Waterkeeper's members, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiff prays judgment against American Reclamation as set forth hereafter.

## VI. RELIEF REQUESTED

106.    Wherefore, LA Waterkeeper respectfully requests this Court to grant the following relief:

a.    Declare Defendants to have violated and to be in violation of CWA section 301(a), 33 U.S.C. § 1311(a), for discharging pollutants from the Facility in violation of a permit issued pursuant to CWA section 402, 33 U.S.C. § 1342, and for failing to comply with all substantive and procedural requirements of the Industrial Stormwater Permit and the CWA;

b.    Enjoin Defendants from discharging pollutants from the Facility to the Los Angeles River and the Pacific Ocean;

c.    Enjoin Defendants to restore all receiving waters damaged by Defendants' illegal discharges of pollutants from the Facility;

d.    Enjoin Defendants from violating the substantive and procedural requirements of the Industrial Stormwater Permit at the Facility;

e.    Order Defendant to pay civil penalties of up to $51,570 per day per violation. CWA § 309(d), 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4 (2016) (Adjustment of Civil Monetary Penalties for

Inflation);

f.          Award Plaintiff its costs (including reasonable attorney, witness, and consultant fees) as authorized by the CWA, 33 U.S.C. § 1365(d); and

g.     Award such other relief as this Court may deem appropriate.

## VII. DISCLOSURE OF NON-PARTY INTERESTED ENTITIES OR PERSONS

Based on LA Waterkeeper's knowledge to date, pursuant to Civil Local Rule 7.1-1, the undersigned, counsel of record for LA Waterkeeper, certifies that no additional parties have a pecuniary interest in the outcome of this case. These representations are made to enable the Court to evaluate possible disqualification or recusal.

Dated: February 8, 2021                    ENVIRONMENTAL ADVOCATES

*Christopher A. Sproul*
_____
Christopher Sproul, Attorney for Plaintiff LOS ANGELES WATERKEEPER